UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Detroit Police Lieutenants and Sergeants Association,

    Plaintiff,

v.                                             Case No. 12-cv-15296

City of Detroit Police Department and           Sean F. Cox
Lamont Satchell,                                United States District Judge

    Defendants.

_____/

**OPINION AND ORDER
DENYING PLAINTIFF DETROIT POLICE LIEUTENANTS AND SERGEANTS
ASSOCIATION'S MOTION FOR PRELIMINARY INJUNCTION**

Before this Court is Plaintiff Detroit Police Lieutenants and Sergeants Association's ("the DPLSA") Motion for Preliminary Injunction. In its motion, the DPLSA requests that this Court declare the alleged confiscation of its members' banked sick, comp, and leave time by the City of Detroit Police Department and Lamont Satchell ("Satchell"), Labor Relations Director of the City of Detroit's Human Resource Department's Labor Relations Division, unconstitutional and restore those funds to its members. In the alternative, the DPLSA requests that this Court "place funds necessary to remedy Plaintiff's outstanding [constitutional] disputes aside in a neutral third party escrow pending resolution of [a related grievance that it previously filed with the Michigan Employment Relations Commission.]" (Docket No. 2, at 1–2.)

1

This action was filed in this Court based on federal question jurisdiction over the DPLSA's constitutional claims. It is yet unclear how this Court has jurisdiction to issue a preliminary injunction, pending the resolution of an arbitration proceeding in a state court, as the parties have not provided any convincing case law suggesting otherwise. Even if this Court has subject matter jurisdiction, the Court finds that DPLSA has not met its burden for this Court to issue a preliminary injunction.

For the reasons that follow, this Court **DENIES** the DPLSA's Motion for Preliminary Injunction [Docket No. 2].

## BACKGROUND

Although the Detroit Police Officer Association (the "DPOA") is not a party to this action, its collective bargaining agreement with the City of Detroit is relevant to this case.

In Article 33.N of the 1998-2001 Collective Bargaining Agreement between the City of Detroit and the DPOA, the City of Detroit instituted a Deferred Retirement Option Program, which read as follows:

> Effective July 21, 2000, a Deferred Retirement Option Program (DROP) plan option shall be made available as a retirement option with the following features:
>
> 1. To participate in the program a member must have at least twenty-five (25) years of active service with the City as a member of the Policemen and Firemen Retirement System . . . .
>
> 4. A DROP accumulation account will be established with an outside investment company chosen by the Union.
>
> 5. The amount paid into the DROP accumulation account shall be 75% of the member's regular retirement allowance plus the annual escalator (2.25% x the full regular retirement allowance x 75%).
>
> 6. Once a member has chosen to place his/her DROP proceeds into the DROP accumulation account, the member shall not be allowed to

> remove those funds until the member permanently retires.
>
> 7. Upon permanent retirement, the member shall be given the right to remove funds from the DROP accumulation account.
>
> 8. When a member permanently retires, the member will receive a regular retirement allowance calculated as if the member retired on the day the DROP account started. The member's retirement allowance shall include all annual escalator amounts (2.25%) that would have been added while the member was participating in the DROP plan . . . .
>
> 10. This program shall be effective only for as long as it is cost-neutral to the City, provided however, that the DROP plan shall continue during the pendency of proceedings, described below, designed to restore the Plan to cost neutrality.
>
> 11. If the City contends that the program is costing it money, including, but not limited to making the City's annual contribution to the P & F Pension System higher than it would be if the DROP Plan was not in effect, the parties, along with the Plan's actuary as well as the actuary appointed by the City, shall meet and confer in good faith regarding the cost. If the parties are unable to reach an understanding, the matter shall be submitted to a third, independent, actuary . . . .
>
> 12. In the event the DROP Plan cannot be changed to restore cost neutrality, it shall be discontinued and participants shall have the option of either (a) retiring, or (b) continuing active employment and resuming participation in the regular retirement plan.

(Docket No. 19-7, at 7–8.)

On July 6, 2009, the DPOA filed a grievance with the Voluntary Labor Arbitration Tribunal ("the VLAT"). The matter was referred to Umpire, George T. Roumell, Jr. ("Roumell"). Roumell summarized the issues in that proceeding as follows:

> Essentially, the grievance raised the issue as to whether there was a mutual mistake as to the years of active service that was set forth in the signed 2004-2009 Agreement required before a member can participate in the [DROP] . . . plan option set forth in the 2004-2009 Agreement. The grievance also addresses a dispute between the parties over the payout rate for the accumulated sick time when an

> officer elects not to receive payment for their accumulated sick time at the time of selecting the DROP Plan, but waits until the officer's actual retirement to receive the payout of accumulated time including sick time.

(*Id.* at 1–4.)

On or around November 12, 2009, Roumell issued an Opinion and Award, stating in relevant part:

> [T]his Umpire is persuaded that the proper rate of pay for all accumulated (including available sick) time for an officer that selects the DROP plan but does not cash out the accumulated time at the time of selecting the DROP plan and instead banks the accumulated time until actual retirement is his/her prevailing rate of pay at the time of actual retirement, not the rate at the time of selecting DROP.
>
> ### AWARD
> The grievance of the DPOA is granted in part and denied in part in that the 2004-2009 Agreement will not be reformed to reduce the DROP plan eligibility to 20 years of service from 25 years. However, the rate of payout of all accumulated banked time including available sick time that is not cashed out or used to calculate final average compensation at the time of DROP selection but cashed out upon the officer's actual retirement shall be paid at the officer's prevailing rate of pay at the time of the officer's actual retirement, and not the officer's rate at the time of the DROP selection.

(*Id.* at 33.)

On November 20, 2009, Roumell received a letter from counsel for the DPOA, stating in relevant part:

> Dear Mr. Roumell: . . .
>
> This is written on behalf of the Association to request that you schedule a conference and, if appropriate, a hearing, to clarify an issue arising out of your Opinion and Award in this case. The issue in question was discussed but not contested in the above-captioned case but the Association believes the best interests of the parties would be served through the issuance of a clarifying Supplemental Award that would eliminate any potential misunderstandings.
>
> In your decision your correctly observed, at pages 9 and 10, that an officer's options at the time of an election to participate in the DROP included either 'cash[ing] out 100% of their accumulated time at their current rate' or applying 25%

4

>   of their accumulated time toward computing of their average final compensation used to compute the computation of their 'average final compensation used to compute the officer's service pension of his/her retirement allowance' and cashing out the remaining 75% at the time of the DROP election. The third option is to keep accumulated time banked and cash it out upon actual retirement; the later issue was disputed and you resolved that issue.
>
>   As a consequence of the uncertainty concerning what you identified as the third (and contested) option, when officers began to elect to participate in the DROP beginning last summer, they were not in a position to make an election decision and most did not. As a result of your ruling, officers are now able to make a fully-informed decision and to the extent they did not do so when they elected to participate in the DROP over the last several months they should now be given that opportunity. Accordingly, the Association believes a Supplementary Award is necessary to make it clear that officers who elected to DROP prior to the issuance of your November 12, 2009 ruling must be given the opportunity to exercise their right to cash out (with or without applying the 25% to the computation of AFC) retroactive to the time of their DROP election . . . .

(Docket No. 19-8, at 3–4.)

The portions of Roumell's November 12th Opinion and Award that counsel for the DPOA cites in his letter are contained in the background section of the November 12th Opinion and Award, and state as follows:

>   [As explained to the Umpire and set forth in Article 33.N, officers/members of the Detroit Police Officer's Association,] [a]t the time of a DROP selection, officers have three options regarding accumulated time such as sick time, vacation time and comp time. First, officers may elect to cash out 100% of their accumulated time at their current pay rate. Second, officers may elect not to cash out the 25% of their accumulated sick time, but cash out the remaining accumulated time at the officer's current rate, and have the 25% non-cashed out accumulated sick time included in the average final compensation used to compute the officer's service pension of his/her retirement allowance. Lastly, an officer may elect not to cash out any of his/her accumulated time, with only 25% of the accumulated sick time added to his/her average final compensation for retirement calculations. Upon retirement, the officer would receive a payout of the 75% accumulated time payout.

(Docket No. 19-7, at 9–10.)

On or around April 20, 2010, in order to remedy the concerns outlined in the letter, Roumell

5

issued a Supplemental Award. In the Supplemental Award, Roumell recognized that:

> the issue of rehearing or a conference with the Umpire initially arose when the Association asked the Umpire to issue a statement stating that the Award was retroactive. The reason for this is that the Award came out on November 12, 2009, whereas the DROP Plan was implemented in either June or July 2009. Officers at the time began electing to participate in the DROP Plan but, because there was no decision on the rate to be assigned for accumulated sick leave at the time of permanent retirement or actual retirement, whatever one wishes to call it, officers did not know whether to elect to cash out accumulated sick time at the time of selecting the DROP Plan or in some cases even whether to make a 25% contribution toward the average final compensation. In fairness to the officers, the officers should have the opportunity at this time, retroactively, to make a decision concerning their sick time. The Supplemental Award that follows will so provide.

(Docket No. 19-8, at 18–19.)

The remedy that Roumell fashioned to address the officers' concerns states in relevant part:

> 2. The Department or City shall notify any officer within (35) days of this Award who has already elected to participate in the DROP Plan of a one-time retroactive opportunity effective with the date of DROP election to cash out some or all of the officer's accumulated time/leave bank including sick leave as well as to have 25% of the officer's accumulated sick leave bank contributed toward determining final average compensation. The notice shall be written notice to those who had elected to participate in the DROP Plan and shall advise those officers that such election shall be sixty (60) calendar days from the officer's receipt of notice of the opportunity to do so.
> 3. In the event an officer makes no election within the time limits set forth herein, accumulated sick time/leave bank may not be cashed out until time of permanent retirement.
> 4. The written notice required by this Award to be provided by the Department shall advise officers who have or elect to participate in the DROP Plan that they are entitled to elect one of the options set forth below at the time of DROP election. Where an officer makes no election, subparagraph (b) shall apply. Available options are:
>   (a)  elect to cash out 100% of accumulated time/leave banks at the then current pay rate; or
>   (b)  decline to cash out any accumulated time/leave banks including sick leave and wait to cash out accumulated time at the time of permanent retirement (at the rate of pay the officer is receiving at the time of permanent retirement); or
>   (c)  have 25% of accumulated sick leave bank included in average final compensation for computation of the officer's retirement allowance

> and either
> (i) retain other accumulated time/leave banks including sick leave to be cashed out at the time of permanent retirement at the rate of pay the officer is receiving at the time of permanent retirement (not the rate at the time of DROP election) or
>
> (ii) immediately cash out remaining accumulated time/leave banks including sick leave at the rate of pay the officer is receiving at the time of the DROP election.

(*Id.* at 20–21.)

Thus, during the VLAT proceeding, there was concern by various officers over the rate to be assigned for accumulated sick leave at the time of retirement. The members were allegedly confused over whether to cash out accumulated sick time or to make a contribution to their average final compensation. (Docket No. 19, 4–5.) The Defendants contend that "[t]o address the officers who were already DROP participants at the time of his April 2010 [Supplemental] [A]ward, Roumell fashioned a remedy which allowed only these members a one time opportunity to cash out their sick bank prior to retirement." (*Id.*)

The Plaintiff in this action, DPLSA, was not a party to the aforementioned arbitration proceedings. But, DPLSA members are subject to a similar collective bargaining agreement that contains a DROP plan provision for its members. (*See* Docket No. 3-2, at 71.) The DPLSA has not established whether or not the DPLSA is bound by the ruling of the VLAT.

On May 24, 2010, in compliance with the Supplemental Award, former Director of Labor Relations, Joseph Martinico, sent a letter and an election form to all the unions who may have members who will be affected by the temporary remedy outlined in the Supplemental Award, including the DPLSA. The letter advised that any officer, who had already elected to participate in the DROP, would be provided with a "one-time opportunity to make an election concerning the bank

and accumulated time [that he or she] . . . had at the time . . . [he or she] elected to participate in the Deferred Retirement Option Plan (DROP)." (Docket No. 19-9, at 2.) The letter further stated that the officers have sixty days from the date of the letter to notify the City of Detroit Police and Fire Retirement System of their election. (*Id.*)

The Election Form contains the following four options:

> [1.] Have all of my unused accumulated Sick Leave and all other accumulated Banked Time Paid to me Now in the usual manner at the current rate and rank. I understand that this will result in NOT having the value of 25% of my unused Sick Leave On Retirement benefit included in my Average Final Compensation calculation.
>
> [2.] Have NO unused accumulated Sick Leave and all other accumulated Banked Time paid to me at this time. All accumulated and unused Sick Leave and other Banked Time will be paid upon separation at my then-current rate and rank.
>
> [3.] Have the value of 25% of my unused accumulated Sick Leave On Retirement benefit included in my Average Final Compensation calculation AND the remaining unused accumulated Sick Leave and all other accumulated Banked Time paid out NOW at my current rate and rank.
>
> [4.] Have the value of 25% of my unused accumulated Sick Leave On Retirement benefit included in my Average Final Compensation calculation AND the remaining unused accumulated Sick Leave and all other accumulated Banked Time left in banks to be paid upon separation at my then-current rate and rank.

(Docket No. 19-9.)

On or around November 16, 2012, City of Detroit Labor Relations Director, Lamont Satchel, sent a letter to Junetta Wynn, President of the DPLSA, asserting as follows:

> In accordance with your collective bargaining agreement, lump sum payments for banked time, other than sick time, are paid out within thirty (30) calendar days of separation. Pursuant to Article 35(L): Retirement and Death Sick Leave Payment - sick leave payments are paid out immediately preceding the effective date of retirement. The Labor Relations Division has prepared a Declaration for DROP

>Retirement form and it has been forwarded to the Pension Office for use by your members. A copy of the document is attached for your files . . . .

(Docket No. 19-10, at 2.)

The "Declaration for Drop Retirement form" described in the letter, states that it only applies to "DPLSA and DPLSA/DFFA Allied Members Only." (*Id.* at 3.) The election form includes only DROP options 2 and 4, meaning that DPLSA members, who elect the DROP, may no longer select DROP options 1 and 3, which essentially means that DPLSA members can only receive their banked time when they separate from employment. (Docket No. 19-10; Docket No. 2, at 5.) Thus, DPLSA members no longer have the option of having their banked time paid to them at the time they select to DROP.

On November 23, 2011, the Plaintiff filed a complaint in Wayne County Circuit Court that was assigned to Wayne County Circuit Court Judge Robert Columbo, *Detroit Police Lieutenants and Sergeants Ass'n v. City of Detroit*, Wayne County Circuit Case No. 11-014543-CL. (Docket No. 19, at 2.) The Defendants allege that, in that case, the DPLSA filed a motion to compel arbitration. (*Id.* at 2.) The Defendants contend that it is their understanding that, with regard to those proceedings, "a motion to reopen the case must be made first, and that has not yet occurred." (*Id.*) At the February 4, 2013, motion hearing, counsel for the DPLSA, advised this Court that, there is currently no arbitration proceeding pending because he has not yet filed a motion with the Wayne County Circuit Court.

The Plaintiff also filed an unfair labor practice charge with the Michigan Employment Relations Commission ("the MERC"). (Docket No. 19-5, at 2.) The exact date of that filing is unclear. The Charge contends that the City violated the DPLSA's collective bargaining agreement by eliminating DROP options 1 and 3. The Charge further states that "[t]he City made this change

9

without notice to the union or opportunity to bargain about such. This change represented unilateral modification of a mandatory term and condition of employment." (Docket No. 2-8, at 3.) That Charge is still pending.

The parties have not provided documents that would fully apprise this Court of the nature of those proceedings, the relief requested in those proceedings, the issues addressed in those proceedings, etc. Instead, this Court only knows that there is a grievance filed with the MERC addressing the issue of whether or not DROP options (1) and (3) have become incorporated into the DPLSA members' collective bargaining agreement.

On November 30, 2012, the DPLSA filed its Complaint for Declaratory and Injunctive Relief in this Court, naming the City of Detroit Police Department and Lamont Satchel as defendants. (Docket No. 1, at 1.) In its Complaint, the DPLSA asserts that the Defendants violated its members' rights under the takings and contracts clauses of the United States Constitution and the Michigan Constitution by eliminating DROP options 1 and 3, which the DPLSA contends have been impliedly incorporated into the collective bargaining agreement. (*Id.* 7–8.)

This Court may exercise federal question jurisdiction in this matter over the DPLSA's claims under the United States Constitution.

In its Complaint, the DPLSA seeks injunctive relief pending resolution of the constitutional claims brought before this Court, as well as the grievance proceeding. (*Id.* at 9.)

On November 30, 2012, the DPLSA filed its motion for Preliminary Injunction, requesting "that the Court declare Defendants' confiscation of Plaintiff's contractually promised benefits unconstitutional and restore the status quo ante prior to the change in policy, and awarding any due benefits to Plaintiff's members, or, in the alternative, direct Defendants to place funds necessary to

10

remedy Plaintiff's outstanding disputes aside in a neutral third party escrow pending resolution of the Plaintiff's grievance." (Docket No. 2, at 1–2, 19.)

## ANALYSIS

### A. This Court DENIES the DPLSA's Motion for a Preliminary Injunction

"A preliminary injunction is an extraordinary remedy designed to preserve the relative positions of the parties until a trial on the merits can be held." *Tenn. Scrap Recyclers Ass'n v. Bredesen*, 556 F.3d 442, 447 (6th Cir. 2009). The party advancing a motion for preliminary injunction bears the burden of establishing entitlement to such relief. *Sisay v. Smith*, 310 Fed. App'x 832, 843–44 (6th Cir. 2009). When considering a motion for a preliminary injunction, the district court must weigh the following factors: "[(1)] that he is likely to succeed on the merits, [(2)] that he is likely to suffer irreparable harm in the absence of preliminary relief, [(3)] that the balance of equities tips in his favor, and [(4)] that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20, 129 S.Ct. 365, 374 (2008).

#### 1. *The Plaintiff Is Not Likely to Succeed on the Merits*

The DPLSA asserts that its claims before this Court, as well as its claims before the MERC, have a reasonable likelihood of success on the merits because DROP options (1) and have (3) become an implied part of the collective bargaining agreement under the past practices doctrine, and the Defendants have taken their banked time, by no longer offering the cash out early options mentioned above, without just compensation in violation of the takings clause and contract clause.

In support of its takings and contract clause claims, the DPLSA relies on *AFT Michigan v. State*, Case No. 303702, 2012 WL 3537789 (Mich. Ct. App. Aug. 16, 2012).

In *AFT Michigan*, various public school employees and their unions filed suit, asserting that

11

M.C.L. § 38.1343e violated the takings and contract clauses of the United States and Michigan constitutions. *Id.* at *1. The statute required employers to withhold three percent of employees' wages for contributions into the employee health trust fund. *Id.* The contribution rate depended, in part, on the employee's start date and salary. *Id.* The teachers, whose salaries were affected by the statute, were subject to a contract that fixed their salaries. *Id.* The Michigan Court of Appeals held that the statute impaired a contractual right "because the statute requires that school employees be paid three percent less than the amount they and their employers freely agreed on in contracts," and effectively took the teachers wages without just compensation, contrary to the takings clause, because "[the statute] does not merely create a general obligation on the part of active employees to pay a certain sum, but instead directs that unique definable monies in which plaintiff employees have a property interest be confiscated by governmental employers. Moreover the confiscated wages are then used to pay the statutorily mandated *employers'* contributions to a state fund." *Id.*

In this action, by contrast, the parties do not dispute that DROP program options (1) and (3) are not expressly contained within the collective bargaining agreement unlike the teachers contracts in *AFT Michigan*. Furthermore, all the documents that the parties provided with their briefs suggest that DROP options (1) and (3) were created temporarily in order to remedy the confusion regarding the arbitration awards, unlike the permanent contribution requirement in *AFT Michigan*.

Presumably, in order to liken their situation to that of the teachers in *AFT Michigan*, the DPLSA argues that DROP options (1) and (3) have become an implied term in the collective bargaining agreement through the past practices doctrine discussed in *Port Huron Educ. Ass'n v. Port Huron Area Sch. Dist.*, 452 Mich. 309, 325–31, 550 N.W.2d 228, 237–240 (1996).

In *Port Huron*, the Michigan Supreme Court held that "[i]n order to create a term or

12

condition of employment through past practice, the practice must be mutually accepted by both parties. Where the collective bargaining agreement is ambiguous or silent on the subject for which the past practice has developed, there need only be tacit agreement that the practice would continue. However, where the agreement unambiguously covers a term of employment that conflicts with a parties' past behavior, requiring a higher standard of proof facilitates the primary goal of the PERA—to promote collective bargaining to reduce labor-management strife. A less stringent standard would discourage clarity in bargained terms, destabilize union-management relations, and undermine the employers' incentive to commit to clearly delineated obligations . . . ." *Port Huron*, 452 Mich. at 325–26, 550 N.W.2d at 237–38. (internal citations and quotations omitted).

Based on the limited evidence that the DPLSA has provided to support its claims, this Court is unable to effectively determine whether or not the past practices doctrine is applicable. The DPLSA has not met its "higher standard of proof" under *Port Huron*. Here, the DPLSA has not provided any evidence suggesting that DROP Options (1) and (3) have become mutually accepted by the parties. The DPLSA has not provided anything describing how many employees exercised those options and whether the options were in effect after the expiration date described in the May 21st letter. Furthermore, the DPLSA has not provided any documents or letters suggesting that the Defendants led the officers to believe that those options would remain in effect after the expiration date described in the May 21st letter. Instead, as mentioned before, all the documents that have been submitted to this Court tend to suggest that DROP options (1) and (3) were temporary remedies to address the confusion regarding Roumell's award. The May 21st and November 16th letters, when read together, add further support to this assertion.

Furthermore, the collective bargaining agreement, relating to DPLSA members, that the

DPLSA provided this Court in support of its motion, was in place since at least 2001. (Docket No. 3-2, at 2.) The May 24th election form, which contained DROP options 1 and 3 and were based of Roumell's Supplemental Award, were a "one-time opportunity." (Docket No. 19-9, at 2; Docket No. 19-8, at 18–21.)

As outlined in *Port Huron*, "the courts require clear and unmistakable evidence of waiver and have tended to construe waivers narrowly." *Id.* at 327, 550 N.W.2d at 238. (internal citations omitted). Furthermore, "[a] collective bargaining agreement, like any other contract, is the product of informed understanding and mutual assent. To require a party to bargain anew before enforcing a right set forth in a contract required proof that the parties knowingly, voluntarily, and mutually agreed to the new obligations." *Id.*

The DPLSA has not even made a minimal showing that the Defendants "knowingly" extended DROP options (1) and (3) beyond the expiration date set forth in Martinico's May 24th letter "in disregard of contract language to the contrary . . . with the intent that [the permanent extension] would supplant the agreement." *Id.* at 331, 550 N.W.2d at 240.

The other cases that the DPLSA cites to, in support of its contract and taking clauses claims, are inapposite for the reasons mentioned above. There is a lack of supporting evidence that the parties intended to change the collective bargaining agreement. Instead, the evidence before this Court points to the contrary. DROP options 1 and 3 are not express terms in the collective bargaining agreement, and the DPLSA has failed to make even a minimal showing that they were so intended.

The DPLSA did not even request an evidentiary hearing to address these concerns.

**2.** *The Plaintiff Is Not Likely to Suffer Irreparable Harm Because There is An Adequate Remedy at Law*

14

The DPLSA argues that irreparable harm is found in cases involving constitutional rights and in instances where the monetary consequences of an adverse arbitration award would likely cause great financial hardship to the State. The Plaintiff also contends that its members will be irreparably harmed because they will lose the opportunity to invest their banked time before they retire.

The DPLSA contends that there is no adequate remedy at law because it is seeking to protect its constitutional rights, which the DPLSA contends have no monetary value.

The Plaintiff cannot establish that it is likely to suffer irreparable harm because any injury in this action can be remedied by damages at law. This Court rejects the DPLSA's assertion that a court cannot fashion damages to include lost investment income and remedy constitutional violations, especially constitutional violations involving contracts. Courts often fashion damages to address constitutional violations and lost investment income. *See, e.g., Titlow v. Corr. Med. Servs., Inc.*, Case No. 11-2535, 2012 WL 6097337, *4 (6th Cir. 2012) ("Plaintiffs may seek money damages from government officials who have violated their constitutional rights. But the officials may claim qualified immunity 'so long as they have not violated a clearly established right.'") (internal citations omitted); *In re Dow Corning Corp.* 419 F.3d 543, 551–52 (6th Cir. 2005) (discussing investment opportunity damages as not being "difficult to estimate" in the context of a liquidated damages clause).

Furthermore, the DPLSA has not provided any evidence, besides mere speculation, that any arbitration award or MERC award in its favor would be so great as to force the City of Detroit into great financial hardship. During the February 4, 2013, motion hearing, counsel for the DPLSA stressed that the City of Detroit may or may not be considering bankruptcy and has considered amending its contractual relationship with unions and its employees. The DPLSA offers only

15

speculation. Counsel for the DPLSA offered no convincing support for these assertions in its briefs or during that hearing. The fact that a city may or may not be considering bankruptcy is irrelevant to the matter before the Court.

During the February 4, 2013, motion hearing, counsel for the DPLSA also contended that the Defendants have been misusing the DROP funds and that there has been a general inability to access DROP funds. The DPLSA provided no convincing evidence with their motion to support these assertions.

> 3. **The Harm to the Public Interest Outweighs Any Harm That May Be Suffered by the DPLSA Members, and the Injunction is Clearly Not in the Public Interest**

Here, the harm to the public interest by essentially requiring the city to put banked time in escrow prior to any determination by this Court with regard to the DPLSA's constitutional claims, as well as the DPLSA's claims before the MERC, outweighs the marginal harm that the members would suffer for their lost investment income potential. Here, as mentioned before, there is an adequate remedy at law, i.e., money damages, which can factor in interest that reflects investment income or investment opportunity.

Likewise, the public interest is not served by putting banked time in an escrow account, given the tenuous nature of the claims advanced by the DPLSA and the general lack of support for those claims provided by the DPLSA.

Injunctive relief is an extraordinary remedy, the DPLSA has filed to meet its burden.

## CONCLUSION AND ORDER

**IT IS ORDERED** that the DPLSA's Motion for Preliminary Injunction [Docket No. 2] is

**DENIED**.

    **IT IS SO ORDERED**.

                                                       S/Sean F. Cox
                                                       Sean F. Cox
                                                       United States District Judge

Dated: February 11, 2013

I hereby certify that a copy of the foregoing document was served upon counsel of record on February 11, 2013, by electronic and/or ordinary mail.

                                                       S/Jennifer McCoy
                                                       Case Manager